# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF ARKANSAS
# FAYETTEVILLE DIVISION

**BEST IN CLASS SUPPLIERS, LLC**                                                             **PLAINTIFF**

**V.**                                    **CASE NO. 5:19-CV-05046**

**INCIPIO, LLC**                                                                              **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Now pending before the Court are Defendant Incipio, LLC's Second Motion to Compel Arbitration (Doc. 22) and Brief in Support (Doc. 23), Plaintiff Best in Class Suppliers, LLC's Response in Opposition (Doc. 25), and Incipio, LLC's Reply (Doc. 28). On August 20, 2019, the Court held a hearing on the Motion, and the parties were afforded an opportunity to present oral argument. At the close of the hearing, the Court took the Motion under advisement. Now, having reviewed the parties' briefing and considered their arguments made during the hearing, the Motion (Doc. 22) is **GRANTED** for the reasons set forth below.

## I.     BACKGROUND

The parties to this lawsuit are Defendant Incipio, LLC, a California company that manufactures and sells cell phone accessories, and Plaintiff Best in Class Suppliers, LLC ("BICS"), an Arkansas company that brokers sales between manufacturers and distributors of products and Walmart, Inc., Sam's Club, Walmart.com, and Samsclub.com. The facts relevant to the parties' dispute began on June 16, 2015, when BICS entered into a Non-Exclusive Sales Representative Agreement (Doc. 21-1, "Agreement") with Incipio Technologies, Inc.—a company the Defendant describes as its predecessor in

1

interest. The Agreement identifies Incipio Technologies, Inc. as "Client" and BICS as "Representative." *Id.* at 1.

A brief overview of some of the more important provisions of the Agreement is necessary in order to understand the parties' current dispute about arbitration. Section 1.1 of the Agreement generally describes the parties' business relationship, including the services that BICS agreed to provide; BICS's obligation to "effectively and diligently market and promote the sale of the Products"; and BICS's promise to front all costs associated with marketing Incipio's products to Walmart in exchange for Incipio's agreement to pay BICS certain commissions on sales. *Id.* Section 1.1 further specifies that BICS "will not represent any other manufacturer during the term of this Agreement" in such a way that would constitute "direct competition with the services to be performed by Representative for Client during the term of this Agreement." *Id.* at 2.

Sections 2.1 and 2.2 explain the method for calculating commissions, including the calculation of "Net Sales" and the deadline by which commissions should be paid. *Id.* at 3.

Section 3.1 contemplates the termination of the parties' business relationship as follows:

> **Termination With Notice**. This Agreement shall terminate immediately upon receipt of written notice if: (i) upon the institution by or against either party of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of either party's debts, (ii) upon either party making an assignment for the benefit of creditors, or (iii) upon either party's dissolution or ceasing to do business.

*Id.*

Section 7.6 deals with the assignment or transfer of the parties' rights under the Agreement as follows:

2

> **Assignment**. The Agreement is not assignable or transferable by Client. This Agreement is not assignable or transferable by the Representative without the written consent of Client, which consent shall not be unreasonably withheld or delayed.

*Id.* at 7.

And finally, the arbitration clause appears at Section 7.14 as follows:

> **Arbitration**. Any controversy, dispute, or claim arising out of or related to this Agreement or breach of this Agreement shall be settled solely by confidential binding arbitration by a single arbitrator in accordance with the commercial arbitration rules of JAMS in effect at the time the arbitration commences. The award of the arbitrator shall be final and binding. No party shall be entitled to, and the arbitrator is not authorized to, award legal fees, expert witness fees, or related costs of a party, The arbitration shall be held in Orange County, California, or such other place as shall be mutually agreed upon by Representative and Client.

*Id.* at 8.

It appears the parties' business relationship continued without incident for the next several months after the Agreement was signed. Then, on or about December 31, 2015, Incipio, LLC—the Defendant in the case at bar—assumed the rights and responsibilities of Incipio Technologies, Inc. under the Agreement. After the transfer, Incipio, LLC became the "going forward" operating entity under the Agreement. However, Incipio Technologies, Inc. did not cease to exist at that time. The California Secretary of State's website confirms that Incipio Technologies, Inc. has been registered to do business since May 3, 2000, and is currently in "active" status. *See* https://businesssearch.sos.ca.gov/ CBS/SearchResults?filing=False&SearchType=CORP&SearchCriteria=incipio&SearchSubType=Keyword (last visited September 5, 2019).[1]

---

[1] The Court may take judicial notice of a state government's official website. *See Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (citing *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011)).

During the hearing on the Motion to Compel, counsel for BICS confirmed that his client was never explicitly informed by way of a letter or email that Incipio, LLC was assuming the obligations of Incipio Technologies, Inc. under the Agreement. Counsel admitted, however, that BICS noticed toward the beginning of 2016 that a different entity (Incipio, LLC) was now signing the commission checks. Instead of objecting or asking questions at that time, BICS simply continued performing under the Agreement, just as it always had.

Any uncertainty that BICS might have had during the first quarter of 2016 must have evaporated by April of 2016, when it entered into a written amendment to the 2015 Agreement with Incipio, LLC. This amendment was titled "First Amendment to Non-Exclusive Sales Representative Agreement." (Doc. 21-2, "First Amendment"). Interestingly, the First Amendment defined the "Client" as "Incipio, LLC" and made no reference at all to Incipio Technologies, Inc. In fact, the First Amendment treated Incipio, LLC as if it were the same entity as the "Client" in the original Agreement. This is readily observed in the preamble to the First Amendment, which immediately followed the identification of the "Client" as Incipio, LLC:

> **WHEREAS,** Client and Representative have previously entered into that certain Non-Exclusive Sales Agreement effective as of June 16, 2015 (the "Agreement"); and
>
> **WHEREAS,** Client and Representative desire to amend the terms of the Agreement on and subject to the terms and conditions as set forth below.

*Id.* at 1.

The First Amendment altered how commissions were calculated and identified specific products that were to be sold at Walmart and its affiliates through BICS's efforts.

*See id.* at 3. Otherwise, the First Amendment made no other material changes to the Agreement and expressly incorporated all the original terms of the Agreement that did not conflict with the First Amendment's terms. *See id.* at paragraph 3 ("Except to the extent expressly modified by this First Amendment, *all other terms, conditions and provisions of the Agreement shall apply and remain in full force and effect.*" (emphasis added)).

About six months after the First Amendment took effect, Incipio, LLC and BICS entered into another written amendment to the Agreement, entitled "Second Amendment to Non-Exclusive Sales Representative Agreement." (Doc. 21-3, "Second Amendment"). The Second Amendment, which was entered into on October 4, 2016, listed the "Client" as "Incipio, LLC" and again incorporated by reference all the terms of the original Agreement. The Second Amendment modified the commission schedule as to one product but made no other substantive changes. Moreover, the Second Amendment, like the First, provided that "all other terms, conditions and provisions of the Agreement" would "apply and remain in full force and effect," except to the extent there were "any inconsistencies or ambiguities . . . ." *Id.* at 1.

According to the Amended Complaint filed by BICS (Doc. 21), the relationship between the parties began to deteriorate sometime around January of 2017. By the end of 2017, BICS claimed that Incipio, LLC owed it $152,164.13. Around January 2, 2018, BICS sent an invoice to Incipio demanding another $240,930.58. That brought the balance owed to BICS to $393,094.71. Incipio then made a small payment to BICS on January 3, but the amount owed kept increasing over time. Although Incipio was making incremental payments of tens of thousands of dollars, by March 2, 2018, it still owed a balance of $661,160.32. On March 9, 2018, Incipio made a $196,667.00 payment, but

that did not clear the balance sheet, and by May of 2018, the amount due and owing was up to $436,020.58.

This pattern wherein BICS billed Incipio, but Incipio paid only part of the bill, continued throughout the first half of 2018. BICS contends that around on July 31, 2018, Incipio made a commitment to pay BICS $50,000 per week over the next four weeks "to get current." (Doc. 21 at 6). But by mid-September of 2018, Incipio had stopped making any payments to BICS, and BICS now contends it was never paid $480,799.16 in commissions. Incipio ended up terminating the parties' contractual relationship on September 21, 2018. But before BICS could file suit, Incipio invoked the arbitration clause in the Agreement (Article 7.14) and filed a Demand for Arbitration in California, where Incipio is headquartered, on January 25, 2019. (Doc. 21-5). It turns out that Incipio also believes that BICS did not fulfill its obligations under the Agreement. According to the arbitration demand, Incipio argues that BICS violated the terms of the Agreement by, among other things, selling products to Walmart that competed with Incipio's products, failing to keep BICS informed about low stock numbers, interfering with Incipio's business relationship with Walmart, causing Incipio to lose out on valuable sales to Walmart, and making disparaging comments about Incipio to Walmart employees.

On March 4, 2019, BICS's attorney sent a letter to the arbitrator rejecting Incipio's claims and stating BICS's position that the arbitration clause was invalid and unenforceable. (Doc. 21-6). Shortly after that, on March 11, BICS filed the instant lawsuit (Doc. 1), apparently in an effort to litigate the enforceability of the arbitration clause in this forum, rather than in the pending arbitration proceeding. All of that is to say that the issue before the Court now is simply whether the matter should remain here or be arbitrated in

the proceeding that was opened in California. BICS believes that the Agreement—and the arbitration clause in that Agreement—terminated once Incipio Technologies, Inc. ceased to do business (Section 3.1), or, in the alternative, that Incipio Technologies, Inc.'s attempt to assign or transfer its interest in the Agreement to Incipio, LLC was invalid according to the Agreement's terms (Section 7.6). In BICS's view, any agreement to arbitrate, if still valid, would only apply to Incipio Technologies, Inc., and BICS's current dispute about unpaid commissions is not with Incipio Technologies, Inc., but with Incipio, LLC.

From Incipio, LLC's perspective, the arbitration clause is valid. First, Incipio Technologies, Inc. never ceased to do business. Therefore, the termination provision of Section 3.1 never went into effect. Second, even if the assignment or transfer that took place at the end of 2015 was contrary to the prohibition against assignment or transfer in Section 7.6, BICS waived any objection it might have had by continuing to perform under the Agreement for the next two and a half years. Incipio, LLC points out that BICS not only accepted commission payments from it, but also agreed to two separate written amendments to the Agreement that explicitly referenced the Agreement's original terms. For those reasons, Incipio, LLC believes that BICS should be estopped from arguing that the arbitration clause is unenforceable.

## II.   LEGAL STANDARD

Evaluating a motion to compel arbitration requires a court to ask: (1) whether there is a valid arbitration agreement and (2) whether the particular dispute falls within the terms of that agreement. *E.E.O.C. v. Woodmen of the World Life Ins. Soc.*, 479 F.3d 561, 565 (8th Cir. 2007). The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, governs the

enforceability of the arbitration agreement in this case. Under Section 2 of the FAA, written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon grounds that exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has described the FAA as reflecting both a "liberal federal policy favoring arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), and the "fundamental principle that arbitration is a matter of contract," *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006); and "[t]he validity of the agreement is determined by state contract law." *Woodmen*, 479 F.3d at 565.

The party seeking to compel arbitration bears the burden of establishing the arbitration agreement's existence and enforceability, and the facts and evidence must be viewed in the light most favorable to the party disputing the arbitration agreement's existence and enforceability. *See Neb. Machinery Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 741–42 (8th Cir. 2014).

### III. DISCUSSION

The Agreement in this case contains a choice of law provision. *See* Doc. 21-1 at 8, Section 7.13. The parties to the original Agreement specified that the "agreement will be governed by and construed in accordance with the laws of California, without regard to the principles of conflicts of law." *Id.* The Court will therefore use California law in interpreting the contract.

The Court finds that even if Section 7.6 of the Agreement prohibited the assignment or transfer of Incipio Technologies, Inc.'s rights and Section 3.1 of the

8

Agreement contemplated the termination of the parties' business relationship if one party "ceas[ed] to do business," the fact remains that BICS waived any objection it might have had to any of these provisions when it continued to perform under the Agreement after it received at least constructive notice that Incipio, LLC had taken Incipio Technologies, Inc.'s place as "Client." Certainly, BICS was on actual notice of the change at the time it agreed to the First Amendment to the Agreement in April of 2016—which explicitly referred to and incorporated the terms of the original Agreement, including the arbitration provision at Section 7.14—and when it agreed to the Second Amendment in October of 2016.

During the motion hearing on August 20, counsel for BICS agreed that after the First Amendment went into effect in April of 2016, the parties behaved exactly as though they believed they were governed by the First Amendment, including the First Amendment's explicit reference to and incorporation of the original Agreement's terms. Counsel admitted that the only thing that changed about how the parties performed under the Agreement from January 2016 until October of 2016 was an expansion of the product line. When the parties signed the Second Amendment to the Agreement in October of 2016, the only thing that changed was the pay rate for commissions.

BICS argues that the Agreement ceased to exist the moment that Incipio Technologies, Inc. attempted to transfer its rights and interest in the Agreement to Incipio, LLC in December of 2015. This position is, as counsel conceded at the hearing, a "technical" one that strains common sense and basic principles of contract law. BICS must concede that it continued to represent Incipio's products to Walmart and its affiliates in the same way it always did, and continued to do so for two and a half years thereafter,

despite being placed on notice that the "Client" it had previously dealt with had changed. BICS took the position in its briefing and at the hearing that during the time Incipio, LLC did business with BICS—operating under the same terms of the Agreement and abiding by the First and Second Amendments that incorporated those same terms—the Agreement really did not exist anymore, and the parties continued to do business according to an oral agreement of some sort. Clearly, this position is untenable. Both BICS and Incipio, LLC performed under the terms of the Agreement for a substantial period of time, without objection from BICS, after Incipio, LLC assumed all the rights and interests of Incipio Technologies, Inc., the original party to the Agreement.

Reviewing all the undisputed facts at issue here, it strikes the Court as too late and too convenient for BICS to protest the enforcement of only one provision of the Agreement when it enjoyed the benefit of all the other provisions of the Agreement and performed under the Agreement's terms for some time. BICS believes the arbitration provision of the Agreement is no longer effective because the assignment of interest from Incipio Technologies, Inc. to Incipio, LLC was invalid. Yet, BICS admits that it had actual notice of the change in entities and failed to object, instead conducting business as though the change was unremarkable. Only now that the parties have become embroiled in a contentious dispute has BICS changed its tune and lodged its late objection by opposing the enforcement of the arbitration provision. BICS's behavior here is a classic example of waiver. "Waiver is the intentional relinquishment of a known right after full knowledge of the facts and depends upon the intention of one party only." *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Café & Takeout II, Ltd.*, 30 Cal. App. 4th 54, 59 (1994). "The waiver may be either express, based on the words of the waiving party, or implied, based on

conduct indicating an intent to relinquish the right." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 31 (1995).

In the alternative, even if the Court were to assume that Incipio, LLC is nothing more than a "nonsignatory" to the Agreement, California law allows non-signatories to an arbitration clause to enforce that clause under any one of the following six theories: "(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter-ego; (e) estoppel; and (f) third-party beneficiary." *Suh v. Superior Court*, 181 Cal. App. 4th 1504, 1513 (2010) (citation omitted). At least three theories apply in the case at bar. First, Incipio, LLC was incorporated as a party to the Agreement through the specific language in the First and Second Amendments to the Agreement. Second, BICS explicitly recognized Incipio, LLC's assumption of its predecessor's privileges and obligations when BICS agreed to and performed under those Amendments. Third, California law on the estoppel doctrine holds that "a nonsignatory . . . may invoke an arbitration clause to compel a signatory . . . to arbitrate its claims when the causes of action against the nonsignatory are 'intimately founded in and intertwined' with the underlying contract obligations." *Molecular Analytical Sys. v. Ciphergen Biosystems, Inc.*, 186 Cal. App. 4th 696, 705–06 (2010). Here, the causes of action BICS brings against Incipio, LLC are "intimately founded in and intertwined" with the underlying obligations in the Agreement, as amended.

Given the Court's analysis above, the case will be dismissed in favor of proceeding with the ongoing arbitration action in California, as the arbitration provision in the Agreement is binding on BICS and Incipio, LLC. BICS has expressed concern that once the case is sent to arbitration, Incipio, LLC will adopt a position contrary to the one it has

taken in this Court and argue that it is not, in fact, bound by all the provisions in the Agreement, including those relating to limitations on damages. However, counsel for Incipio, LLC stipulated in open Court that his client would not argue in arbitration that the Agreement is unenforceable or that its terms do not apply to the parties' dispute.

## IV.   CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Incipio, LLC's Second Motion to Compel Arbitration (Doc. 22) is **GRANTED**. Although a stay would be appropriate, the case is **DISMISSED WITHOUT PREJUDICE** pursuant to Federal Rule of Civil Procedure 12(b)(6). The Eighth Circuit has held that "district courts may, in their discretion, dismiss an action rather than stay it where it is clear the entire controversy between the parties will be resolved by arbitration." *Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769–70 (8th Cir. 2011). The Court finds that the entire controversy between the parties will be resolved by arbitration.

**IT IS SO ORDERED** on this 6th day of September, 2019.

/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE